Jessica Carson
902 State St
Osage, IA
641-330-1987
jessicalynncarson1234@gmail.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| JESSICA CARSON, | Civil Action No. 6:26-cv-02001-LTS-KEM |
| Plaintiff, | |
| v. | JURY DEMAND |
| NATIONAL RAILROAD PASSENGER CORPORATION (AMTRAK), et al., | |
| Defendant. | |

## COMPLAINT (FRSA Retaliation/Whistleblower)

Plaintiff Jessica Carson ("Plaintiff" or "Ms. Carson"), for her Complaint against Defendant National Railroad Passenger Corporation d/b/a Amtrak ("Amtrak" or "Defendant"), states as follows:

# I. INTRODUCTION

## 1. Nature of the Action

1.) This is an action under the Federal Railroad Safety Act ("FRSA"), 49 U.S.C. § 20109, Title VII of the Civil Rights Act, and other applicable federal protections, arising out of Defendant National Railroad Passenger Corporation's (Amtrak's) unlawful retaliation against Plaintiff following her reports of serious safety, regulatory, and

1

compliance violations affecting railroad employees and passengers. Plaintiff engaged in multiple forms of protected activity, including reporting safety hazards, regulatory noncompliance, fraudulent conduct, and discrimination. In response, Amtrak subjected Plaintiff to escalating retaliation—including isolation, pretextual discipline, career suppression, and ultimately wrongful termination—in violation of the FRSA's and Title VII's whistleblower and anti-retaliation provisions. Reported concerns included, among others:

   a. Restricted Medication Policy-
      Amtrak's Restricted Medication Policy allows safety -sensitive employees, including passenger train engineers and other operating employees, to work while taking methadone and other controlled substances. Plaintiff questioned the safety of the policy that makes no distinction between safety sensitive workers and non-safety sensitive workers, conflict with industry standards and create unacceptable risks of catastrophic injury and death.

   b. Regulatory and medical record integrity-
      Regulatory and medical exam charts in Amtrak's systems were left unlocked and editable, creating opportunities for tampering and undermining the integrity of federally regulated fitness for duty and medical decisions.

   c. Blood-borne pathogen program gaps-
      Amtrak failed to meet regulatory requirements for its blood-borne pathogen program, leaving employees exposed to blood and bodily fluids on trains and in facilities without timely access to required immunizations in the event of exposure, offer/declination forms for preventive vaccination, and appropriate PPE or disposal systems to clean up biohazard spills or dispose of used needles properly.

   d. Hearing conservation program failures-
      Amtrak failed for over 5 years to provide required annual audiograms and to report work-related hearing losses to the Federal Railroad Administration ("FRA"), and continued to fail at basic compliance over a year after using Plaintiff's correction action plans, data validation work, and free scalable solutions to pass an FRA audit.

   e. Abuse of the DOT exam processes-
      Leadership misused the DOT exam processes, including ordering examinations despite knowing the employee had a disqualifying condition, using methadone, and failed to effectively communicate that critical information to the DOT examiner when they ordered the exam or to the downstream staff who would record the results of the DOT examiner's determination. Leadership treated the DOT exam process as de facto lie-

detector tests rather than regulated medical evaluations, creating unnecessary safety risks.

    f.   Abuse of the Drug and Alcohol Policy-
Leadership abused the Drug and Alcohol designed to keep employees safe by requiring EAP clearance and drug testing based on an unlicensed coordinator's conjecture, with no direct observation of the employee and no report from the employee's manager regarding reasonable suspicion.

    **g.**  Return to Work/fitness for duty procedures-
Leadership applied return-to-work and fitness-for-duty policies inconsistently and selectively, disregarding written procedures, exposing safety-sensitive positions to unmanaged risk, and targeting Plaintiff when she insisted on compliance.

    (Refer to detailed event descriptions and cross-referenced exhibits outlined by **Exhibit 1**- Event Timeline)

*2.)* Plaintiff also designed and offered scalable, low-cost/free solutions to close these gaps, including digital tools, automated compliance dashboards and alerts, process maps, and risk models that would have improved regulatory compliance, protected employees and passengers, and supported Amtrak's own public commitments to "safety first".

# 2.)    Protected Activity and Retaliation

*3.)* Plaintiff is a highly experienced safety, risk and regulatory compliance professional, continuous improvement practitioner, and registered nurse with extensive railroad experience who joined Amtrak with a strong performance history and exceptional recommendations. She received excellent performance evaluations, no prior discipline, and a merit award before the retaliation described in this Complaint.

*4.)* In the course of her employment, Plaintiff engaged in multiple forms of protected activity under FRSA by reporting the above safety and compliance concerns, in good faith, through the channels Amtrak itself provided and promoted, including:

        i.   **Direct reports to her immediate supervisors** regarding safety and security concerns relating to the Restricted Medication Policy allowing safety sensitive workers to drive with on methadone,

unlocked/editable medical and regulatory exam record systems, potential tampering with Plaintiff's existing charted records, concerns for fitness for duty, clinical decision making causing direct employee harm, lack of consistency in the Return to Work SOP for safety sensitive workers, racially charged statements/harassment/ intimidation/and ostracization against her in a group chat, hostile work environment, failures in Bloodborne Pathogen Exposure Control Program related to regulatory compliance, and Hearing Conservation Program regulatory compliance ;

ii. **HR Business Partners** regarding retaliation and safety concerns for the gaps in the DOT regulatory exam process, hostile work environment, lack of evidence or due process, restriction of information needed to perform fitness for duty evaluations through job analysis;

iii. Escalations to executive leadership in SVP Safety & Security and SVP HR regarding fraudulent and retaliatory write up, HR Business Partner's gross mismanagement of the disciplinary action, concerns regarding the safety of the Restricted Medication Policy allowing safety sensitive workers to drive while on methadone, hostile work environment, retaliation for protected safety reports and resistance to participating in unsafe and illegal acts relating to the Drug and Alcohol Policy, selective policy application of the return to work policy creating safety risks, gaps in the DOT Regulatory exam process and misuse of the DOT regulatory exam certification process;

iv. Reports to Employee Relations and HR Investigators regarding everything report to her immediate supervisors in addition to a fraudulent and retaliatory Written Counseling in response to her safety reports and concerns regarding participation of violating Drug and Alcohol Policies, HR's failure to perform due process or ensure policy application, application of a 12 month promotion ban to a first time warning despite no policy existing to support it, removal from projects and programs, job title demotion after near miss reports, and significant career suppression caused directly by the Defendant and agents working through it;

v. 3 Near-Miss/formal safety submissions through Amtrak's Voluntary Safety Reporting System;

vi. Formal submissions to Amtrak's Office of Inspector General ("OIG") online portal, and a separate 2.5-hour investigation with the Sr. Criminal investigator along with over 150 evidentiary documents

4

submitted, describing everything reported to Employee Relations, Human Resources Investigators, Amtrak's Voluntary Safety Reporting System, SVP of HR and Safety and Security, and additionally, procedural fraud and retaliation by Employee Relations and Human Resources, obstruction and false statements by Human Resources, gaps in the Amtrak Drug and Alcohol policy, Bloodborne Pathogen Program, Hearing Conservation Program, and Restricted Medication Policy causing national safety risks with engineers able to drive passenger trains while intoxicated with methadone and no functional risk controls in place to identify the risk, and the relation to the Drug and Alcohol Program and Restricted Medication Policy gaps to a 2019 OIG/DOT/FRA/NTSB investigation into Amtrak's Drug and Alcohol program that was performed after a derailment that killed 2 works and injured 36 people, closing of formal near miss safety reports without legitimate or conflicted investigation while leaving the safety risks unaddressed;

vii. Written complaints to Amtrak's Board of Directors with an event timeline that detailed the protected activity and corresponding retaliation, a briefing that outlined the conflict of interest in centralizing all authority to the Chief Legal Officer immediately after my report to the OIG- as CLO, Chief of HR, Corporate Ethics Officer, and Board Secretary- that allowed and enabled retaliation against whistleblowers, concern for employee and passenger safety regarding the Bloodborne Pathogen Program and ethics complaints regarding senior leadership and a retaliatory culture that puts national safety at risk, the retaliatory and fraudulent Written Counseling, job title demotion, termination under the guise of an RIF after reporting at every level of the organization and their oversite, and significant career suppression and unjust enrichment by leadership as a result of retaliation for protected safety reports and dissent in participating in unlawful and unsafe acts, refusal of Amtrak leadership to correct structural safety risks despite adequate knowledge and resources;

viii. A whistleblower complaint to OSHA under FRSA regarding all issues reported to Amtrak and Amtrak OIG, and additionally, the abdication by Amtrak OIG to protect a whistleblower and insulating the retaliatory employees from accountability

5.) Amtrak, through its managers, HR, Employee Relations, OIF, Legal Department, and Board of Directors, had actual and explicit knowledge of Plaintiff's protected activity because she reported directly to them, copied them on written complaints,

and participated in interviews and investigations where she described the risks and the retaliation, and provided substantial amounts of evidence to Senior Leadership, Employee Relations, HR, Amtrak OIG- over 150 documents.

6.) Rather than remedy the hazards or support Plaintiff's efforts to bring Amtrak into compliance, Amtrak, acting through its agents and managers, retaliated against Plaintiff in direct and escalating response to her protected activity. The retaliatory actions included, but were not limited to:

a. Issuing a fraudulent and retaliatory written counseling that is demonstrably false and re-characterized Plaintiff's protected activity as "insubordination", imposed a twelve-month promotion ban while misrepresenting the absence of any policy supporting a promotion ban, labeled the Plaintiff as negligent for following the processes the very leadership writing her up had designed, and cited innocuous phrases such as "nursing judgement" and "chastised" as "disturbing the harmony of the group" as pretext for discipline.

b. Editing and undermining regulatory exam records associated with the very safety issues Plaintiff reported, while blaming her for their failure to communicate a change in normal process or effectively notify her of risk.

c. Blocking Plaintiff's promotional opportunities and removing her from continuous improvement, job risk analysis projects, and regulatory compliance work for which she had been recruited and recognized for, thereby further suppressing her career advancement.

d. Subjecting Plaintiff to heightened scrutiny, surveillance, and hostile treatment, including demands that she consent to being recorded when others were not, tolerance of racially charged and hostile comments directed at her, and punishment of allies who supported her safety concerns.

e. Demoting Plaintiff's job title and marginalizing her role within the department just two days after she submitted near-miss safety reports.

f. Terminating Plaintiff's employment in a purported reduction-in-force that required 23 positions to be eliminated in the Safety and Security Department, in which 17 empty positions were eliminated and the Plaintiff was 1 of 6 employees out of hundreds of employees in the Safety and Security Department that were terminated, while the leaders who failed to maintain regulatory compliance and whom she had reported for retaliation and safety violations, were allowed to make the decisions regarding her termination and remained in place.

6

g.  Post termination retaliation, including delaying unemployment verification, withholding severance provided to the other RIF employees for 8 months, delaying payment of unused PTO, refusing to meaningfully engage in settlement discussions 6 months after asking to settle with Plaintiff and a secondary whistleblower in a global settlement.

7.) The proximity between Plaintiff's protected reports and these adverse actions, the shifting and inconsistent explanations offered by Amtrak, evidence of animus, personal benefit to of the retaliators in Plaintiff's termination, and the company's decision to retain every leader in the retaliation chain while targeting Plaintiff and a fellow whistleblower, all support a strong inference that Plaintiff's protected activity was not just a contributing factor in Amtrak's actions in violation of FRSA, but motivation to silence Plaintiff from continued protected activity.

## 3.)    Plaintiff Seeks

8.) Plaintiff seeks relief to make her whole and to prevent further retaliation, including:

a.  Reinstatement to a position comparable to, or higher than, the position she would have attained absent retaliation, in a role outside the chain of retaliating leadership; or front pay and compounding benefits equivalent to the level Plaintiff would have attained absent retaliation in lieu of reinstatement.

b.  Removal of retaliatory decision makers from positions of authority and any influence over Plaintiff's employment, over whistleblower and safety reporting processes, over control of communication with Amtrak's Board of Directors, and structural changes necessary to ensure that regulatory compliance and safety are prioritized and comply with FRSA.

c.  Back pay with interest, restoration of lost benefits, and front pay as needed.

d.  Compensatory damages for emotional distress, reputational harm, and career suppression, and punitive damages to the maximum amount allowable by law.

e.  Expungement of the retaliatory written counseling with promotion ban and any related disciplinary records from Plaintiff's personnel file, and affirmative measures to repair her professional reputation.

f. Injunctive relief requiring Amtrak to correct unsafe policies and practices Plaintiff reported- including but not limited to, the Restricted Medication Policy, DOT exam procedures, unlocked medical and regulatory records, and deficient safety programs- and to implement safeguards that protect employees who raise safety concerns with ongoing audit of documented evidence of good faith investigations and risk mitigation.

g. License-Protection and Record Clarification Relief- an order requiring Amtrak to

1. Issue a written statement on company letterhead, signed by an appropriate executive, confirming that:

    i. Plaintiff followed the documented fitness-for-duty and charting procedures she was given;

    ii. During Plaintiff's employment, Amtrak's systems allowed non licensed personnel to create and modify regulatory and medical exam records, and;

    iii. Any later concerns about the accuracy or completeness of those records may reflect system and leadership failures, not misconduct by Plaintiff.

2. Place that statement in Plaintiff's personnel file and provide a copy, on Plaintiff's request, to any nursing licensing board, credentialing entity, or future employer who inquires about her work history at Amtrak.

3. Agree not to assert, in any future licensing or employment proceeding, that Plaintiff falsified or mishandled those records or clinical assessments based on records she did not control, and to reasonably cooperate in defending her if those records are used against her.

h. Attorney's fees and costs if any arise, and such other legal and equitable relief as the Court deems just and proper.

8

# II. JURISDICTION AND VENUE

9.) This Court has federal question jurisdiction under 28 U.S.C. § 1331 because Plaintiff's claims arise under federal law, including the FRSA, 49 U.S.C. § 20109.

10.) Jurisdiction is also proper under 28 U.S.C. § 1349 because the United States owns more than one-half of the capital stock of Amtrak and Amtrak performs business in Iowa.

11.) Plaintiff filed a timely whistleblower complaint with OSHA on May 7, 2025. More than 210 days have passed since that filing (210 days elapsed as of December 3, 2025) and no final decision has been issued, entitling Plaintiff to bring this action in federal district court under 49 U.S.C. § 20109(d)(3).

12.) Venue is proper in the Northern District of Iowa, Eastern Division, because Plaintiff worked for Amtrak while residing in this district as a 100% remote worker, the retaliatory decisions impacted her here, and a substantial part of the events or omissions giving rise to her claims occurred in this district.

# III. PARTIES

13.) Plaintiff Jessica Carson is an individual residing in Osage, Iowa. At all relevant times she was employed by Amtrak as a Senior Occupational Health Nurse and performed work affecting railroad safety and health.

14.) Defendant National Railroad Passenger Corporation d/b/a Amtrak ("Amtrak") is a federally chartered corporation with its principal place of business in Washington, D.C. Amtrak operates passenger rail service throughout the United States and conducts business in the Iowa.

# IV. STATUTORY BACKGROUND

15.) 49 U.S.C. § 20109(a)-(b). FRSA prohibits a railroad carrier from discharging, demoting, suspending, or otherwise discriminating against an employee because the employee, among other things, reports a work-related injury or safety concern, reports a violation of federal law relating to railroad safety or security, or reports such concerns to the employer, the Secretary of Transportation, OSHA, the FRA, or other oversight bodies, or refusing to violate or assist in the violation of any law relating to rail safety or security.

16.) FRSA uses a "contributing factor" standard: Plaintiff must show that her protected activity was a contributing factor in the adverse action. The railroad can avoid liability only by proving by clear and convincing evidence that it would have taken the same action in the absence of the protected activity.

# V. FACTUAL ALLEGATIONS

## A. Plaintiff's Role and Performance

*17.)* Plaintiff has worked in safety-critical environments for years, including as an ER charge nurse and occupational safety leader and consultant in the rail industry. She has worked across healthcare, biopharmaceutical manufacturing, Union Pacific Railroad, and consulted for short-line and port railroads across the country in safety, fitness for duty, continuous improvement, and regulatory compliance. She built a brand new digital safety management system called RISE, which uses risk prediction and a closed loop system to engineer intelligent operating systems for company wide transformation and recently obtained a provisional patent. At Amtrak, she served as a Senior Occupational Health Nurse supporting system-wide regulatory compliance and safety-sensitive fitness for duty clearances. She was asked by senior leadership to work on rebuilding the Hearing Conservation Program and Blood-borne Pathogen Program by her leadership and worked cross-functionally across many stakeholders and departments. She identified significant on-going compliance and safety issues with these programs and built solutions to mitigate those issues on top of doing her full time work in Medical Services. Plaintiff is a regulatory compliance expert with a Bachelors Degree in Environmental, Safety, and Risk Management and professional licensure as a Certified Safety Professional (CSP), one of only two in the organization at the time of her employment, and the only employee in the broader Safety and Security Dept. with the unique combination of a college degree in safety and risk, CSP, previous Class 1 railroad experience, and experience leading a company through transformation, achieving OSHA VPP Star Award for her company site at Zoetis.

*18.)* Prior to February 2025, Plaintiff's annual performance evaluations were positive and she had no discipline in her file. She received a Tier award for her work on the Hearing Conservation Program and senior leadership had requested she work cross functionally on regulatory compliance, was mentoring her, and positioning her for promotion outside of Medical Services to utilize her skills in Continuous Improvement, regulatory compliance, injury and risk management, and her innovation and digital design skills.

12

# B. Protected Activities

19.) Plaintiff engaged in protected activity under the Federal Rail Safety Act by repeatedly reporting serious safety, regulatory, and compliance concerns affecting railroad employees and passengers. These concerns included, among others, Amtrak's Restricted Medication Policy allowing safety-sensitive employees, including train crews and other operating employees, to work while taking methadone and other controlled substances; unlocked and editable medical and regulatory exam records; long-standing failures in the Hearing Conservation Program; gaps in the Bood-Borne pathogen Exposure Control Program; misuse of the DOT examination process; abuse of the Drug and Alcohol Policy; and selective, inconsistent application of return-to-work and fitness for duty procedures.

20.) Beginning at least as early as February 11, 2024, Plaintiff presented forensic analysis of regulatory failures and corrective action plans to senior safety leadership, including the AVP of EHS, VP of Operational Safety, System Safety leadership, and Sr. Director of Risk and Evaluations. Her briefing identified 109 work-related hearing loss cases that had not been reported to the Federal Railroad Administration over a five-year period, widespread failure to perform annual audiograms, and the corrective measures needed for an upcoming FRA audit.

21.) On October 7, 2024, Plaintiff delivered a detailed analysis and project charter for the Bloodborne Pathogen Exposure Control Program, again documenting regulatory gaps under the same leadership and providing scalable corrective solutions after being asked to rebuild the program due to lack of staff in Occupational Safety and her regulatory and continuous improvement expertise.

22.) In January of 2025, Plaintiff reported additional concerns to her direct leadership- Amtrak's Chief Medical Director and the Senior Nurse Manager of Medical Services, including: unlocked and non-version controlled SOPs relating to return to work and fitness for duty polices affecting employee safety, selective policy enforcement, lack of psychological safety, a questionable EAP referral based solely on an unlicensed coordinator's speculation of substance abuse, and racially charged intimidation and group hostility from a coworker after Plaintiff used the phrase "nursing judgement" in a clinical discussion where an unlicensed coordinator was attempting to publicly intimidate the Plaintiff into clearing the employee to return to work without adequate information to determine the nature of a reported injury before making a professional decision regarding fitness for duty.

13

*23.)* In February 2025, Plaintiff raised concerns that an employee on methadone- a disqualifying condition for obtaining a CDL- had been sent for a DOT exam without that information being disclosed to the examiner, that regulatory exam charts had been altered, the integrity of the DOT exam process was being used as a de facto "lie detector test" instead of a regulated medical evaluation, thereby creating additional unnecessary safety risk, and concerns about the Restricted Medication Policy allowing safety sensitive workers to drive and work while taking methadone- a controlled substance, and retaliation concerns, providing supporting documents such as screenshots of Teams messages, chart excerpts, and progress notes from the methadone driver's medical records.

*24.)* Plaintiff also submitted formal near-miss and safety reports through Amtrak's Voluntary Reporting System documenting the Restricted Medication Policy, unlocked and editable medical and regulatory records, and gaps in the DOT Exam processes in Medical Services Department.

*25.)* In March and April 2025, Plaintiff escalated these concerns outside the normal chain by making a formal whistleblower submission to the Amtrak Office of Inspector General via the online portal and participated in an approximately 2.5 hour interview, providing approximately 150 documents regarding fraud, waste, abuse, retaliation, and national safety risks including safety sensitive workers including Passenger Engineers allowed to work while on methadone by policy and gaps between the Medical Services Department processes, periodical regulatory exam testing processes, and Drug and Alcohol Program that allowed unsafe conditions to exist that would obscure risk. She also filed a whistleblower complaint with OSHA under FRSA while still on Amtrak payroll.

## C. Employer Knowledge

26.) Amtrak, through its managers and executives, had actual knowledge of Plaintiff's protected activity. Plaintiff reported directly to her immediate supervisors in Medical Services and to the Medical Director; to executive leadership including the SVP of Safety and Security Department, the SVP of HR, the SVP of Employee Relations; to HR Business Partners; to the Amtrak OIG; and to the Amtrak Board of Directors and CLO who had also replaced the SVP of HR Plaintiff reported to, was Board Secretary, and also Amtrak's Ethics Officer. Plaintiff used the very channels Amtrak promoted for reporting safety concerns, fraud, waste, and abuse.

27.) On February 19, 2025, Plaintiff provided a "Supporting Evidence Document" with hyperlinked sub-documents as evidence to the Senior Vice President of HR and the Senior Vice President of Safety and Security, summarizing her safety concerns and attaching evidence of chart tampering, lack of due process and gross mismanagement and misuse of the disciplinary process by HR allowing a demonstrably fraudulent written discipline, Restricted Medication Policy risks, unlocked medical records, retaliation, inconsistent policy application, and DOT Exam process misuse.

28.) On February 23, 2025, Plaintiff submitted 3 formal near miss/safety reports through Amtrak's Voluntary Reporting System(AVSRS).

29.) On February 25, 2025, Plaintiff emailed a follow up and additional safety reports to Employee Relations VP and Sr. Investigations Manager after no confirmation of the transfer the SVP of HR stated would happen between him and Employee Relations, for the purposes of an "unbiased" investigation".

30.) On March 3, 2025, Employee Relations leadership, including the VP of Employee Relations and the assigned investigator, received the same evidence via email and SharePoint links, along with Plaintiff's written explanation of the retaliation and safety risks.

31.) On March 10th, 2025, Plaintiff reported concern for critical safety risks including fraud, retaliation, regulatory safety risks, and selective policy application during a 1.5 hour retaliatory meeting with another HRBP, where she was intimidated, harassed, and questioned on "how many cases she has open", "who she has all reported to", and discouraged from reporting to Amtrak OIG and redirected to the "Ethics Hotline", right back to the same of retaliation she had already reported to at every level.

32.) On March 20th, Amtrak Employee Relations was notified of Plaintiff's OIG submission, and by early April, 2025, OIG had conducted a detailed 2.5 hour interview. Amtrak OIG and Amtrak HR and Legal were therefore aware that Plaintiff had made formal protected reports to both internal and external oversight bodies prior to the adverse actions challenged in this Complaint.

33.) On May 12, 2025, Plaintiff notified Amtrak Board, President and Chief Legal Officer of dangerous safety concerns to employees and passengers regarding the Restricted Medication Policy and the use of methadone in safety sensitive workers despite a multiagency investigation into a 2019 fatal derailment with 2 fatalities and 36 injuries relating to controlled substances and Drug and Alcohol Program deficiencies, and other safety risks including:

a.  The Restricted Medication Policy allows safety sensitive employee to take fentanyl and morphine 12 hours before their work shift, with no way to verify whether they are taking it 12 hours before or during their actual shift.

b.  Gaps between periodical physical examination processes and the Drug and Alcohol Program create risk for employees to never have a random drug test or even be pulled out of service if tested and found positive.

c.  40-50% compliance rate with required training and annual audiogram testing after using Plaintiff's corrective action plan work to pass a FRA audit, removing her from the project, and failing to implement the corrective action plans they used to pass to FRA audit, and still lacking basic compliance over a year later.

d.  Lack of protection and disposal while handling biohazards for employees on passenger trains, creating risk for blood born pathogen exposure

e.  Leadership obstruction in compliance with federally regulated compliance programs.

f.  Systemic, patterned, coordinated suppression and retaliation against a whistleblower.

*(Detailed events and evidence described in "Exhibit 1-Event Timeline" and corresponding evidence is cross referenced within the timeline, indicating associated Exhibits )*

## D. Adverse Actions

34.) Rather than remedy the hazards or support Plaintiff's efforts to bring Amtrak into compliance, Amtrak, acting through its managers and decision-makers, retaliated against Plaintiff. Adverse actions included, but were not limited to:

a.  Issuing a February 14, 2025 retaliatory Written Counseling that Plaintiff contends was factually inaccurate and pretextual, with a twelve-month promotion ban unsupported by any policy, disproportionate to a first time warning, and fraudulently reframed her protected activity as "insubordination", despite it being demonstrably false. The written discipline cited Plaintiff for "negligence" for following the policy exactly as the same leadership who was disciplining her had written, and for creating

16

"potential risk" while the same leadership ignored their role in creating. The written discipline abused the authority of the Code of Conduct policy to charge the Plaintiff with "disturbing the harmony of the group" by using the words "chastised" and "nursing judgement", even as those words were used during protected activity.

**b.** Editing and undermining the integrity of regulatory exam records associated with the very safety concerns Plaintiff had reported, including tampering with her 2023 regulatory record and 2024 regulatory exam record in close proximity to the Written Counseling.

**c.** Amtrak, acting through its managers and decision-makers, engaged in a coordinated and systemic campaign of retaliation against Plaintiff, demonstrating reckless disregard for whistleblower protections and for the safety of employees and passengers, including but not limited to the following actions:

  i.   Isolating and restricting Plaintiff from professional networking opportunities, travel, and developmental opportunities;

  ii.  Restricting projects and scope;

  iii. Obstructing progress of projects and regulatory compliance by weaponizing chain of command delays;

  iv.  Removing her from continuous improvement work that would improve process efficiency, and identify and mitigate compliance gaps ;

  v.   Interfering in relationships between Plaintiff and other leadership including her professional mentorship;

  vi.  Targeting of anyone who showed professional support for Plaintiff including fellow nurses, mentors, operational safety staff, and occupational safety staff;

  vii. Co-opting and reassigning her work and innovation to senior leadership without credit;

  viii. Claiming Plaintiff was redundant to justify RIF then posting roles to co-opt the work and innovation they blocked her from;

ix.   Senior Safety Leadership blocking free scalable solutions Plaintiff was already building to satisfy regulatory compliance gaps in the national Blood-borne Pathogen Exposure Control Program, claiming "budget issues" and preference for paper forms over digital;

x.   Publicly belittling, humiliating, and marginalizing Plaintiff;

xi.   Soliciting medical coordinators to monitor and report to leadership any mistake or minor error Plaintiff made, directly to leadership while circumventing Plaintiff and simultaneously creating excessive workload with no additional pay;

xii.   Assigning additional program work in regulatory compliance, then obstructing Plaintiff's efforts in fixing regulatory compliance to avoid spending money on immunizations or PPE that protect employees;

xiii.   Assigning additional program work that allowed them to pay one worker's wage for the work of two safety professionals in separate departments, then refusing to provide any dedicated time to work on the additional assigned work during work hours which caused Plaintiff to work nights and weekends for months on end to complete core Medical Services work while rebuilding national regulatory compliance programs, and then tried to move the project timeline up from 5 months to 2 weeks when they were unsuccessful in sabotaging Plaintiff;

xiv.   Weaponizing subjective words, vague complaints, anonymous complaints, and vague policy interpretation against her while ignoring the underlying safety concerns;

xv.   Tolerating coordinated group hostility, ostracism, and racially charged statements towards Plaintiff in Teams meetings and group chats without intervention;

xvi.   Misrepresenting facts to OSHA and federal government stating Amtrak received no evidence of protected activity and that Plaintiff made vague reports that didn't qualify as protected activity;

xvii.   Coordination between Amtrak Legal and Amtrak OIG in a manner that, Plaintiff contends, buried her whistleblower reports,

18

abdicated their duty to protect a whistleblower, and evaded oversight;

xviii. Citing non-existing policy to justify a 12 month promotion ban and claiming there is no progressive management disciplinary policy despite one existing, and that employees can be disciplined at any time retroactively without informing the employee or documenting it on their performance plan to review or sign;

xix. Employee Relations, HR, and Legal running superficial and biased investigations that, Plaintiff contends, were procedurally improper and designed to avoid accountability of leadership through tactics such as investigating the whistleblower instead of the whistleblower's safety reports, harassing and intimidating Plaintiff for hours on subjective word choice and refusing to discuss the serious safety risks the investigation was scheduled for;

xx. Mischaracterizing Amtrak's personal legal counsel as "independent and neutral third party" to investigate the plaintiff;

xxi. Terminating the SVP of HR and centralizing all authority under the Chief Legal Officer to also act as Chief of HR, Corporate Ethics Officer, and Board Secretary, creating a governance structure that controls the investigation, discipline, termination, and silent erasure of whistleblower;

xxii. Closed near miss/safety reports through the formal voluntary safety reporting system as investigated, while neither investigating the risks or mitigating the risks despite the serious risks to employees and passengers, undermining the integrity of Amtrak's Voluntary Safety Reporting System

d. Demoting Plaintiff's job title from Senior Occupational health Nurse to lead Nurse on or about February 25, 2025, just two days after she submitted formal near-miss reports through the Voluntary Reporting System documenting safety concerns.

e. Terminating Plaintiff's employment on May 6, 2025, in a purported reduction -in-force that eliminated only six employees in the entire Safety & Security Department that included hundreds of employees, including Plaintiff, despite the availability of more logical, less retaliatory choices to meet any claimed cost-saving directive. Then redistributed her work to the remaining two nurses in the same position Plaintiff was employed in. No paperwork or email was provided regarding reason for termination to the

Plaintiff, despite confirming her address, phone number, and email address while terminating her and instructing Plaintiff she would receive that documentation and severance package between 24-48 hours after the meeting. The justification that the AVP of EHS gave while informing Plaintiff through a Teams meeting, was "budget" and "cost savings measure".

    **f.** Engaging in continuing post-termination retaliation, including:

        *i.* Withholding severance provided to other RIF-affected employees and indicated by policy- for 8 months, until Plaintiff sent notice of intent to file for emergency injunctive relief within the Federal Court system.

        *ii.* Delaying unemployment verification and payment of unused PTO

        *iii.* Refusing to meaningfully engage in settlement discussions, refusing neutral mediators including a retired federal judge from Iowa, and delaying mediation for 6 months after requesting private global settlement with Plaintiff and former Amtrak nurse who also has a case docketed with OSHA against Amtrak for similar complaints;

        *iv.* Using public messaging about "safety is non-negotiable", desiring "transformation", "leadership accountability", and that "no one should pay the price for doing the right thing" specifically in the updated whistleblower policy while leaving the reported risks and retaliators in place

        *v.* Refusing to fulfill FOIA requests

## E. RIF Decision and Termination

35.) On May 6, 2025, Amtrak selected Plaintiff for termination in a purported reduction-in-force. Plaintiff was one of only six employees terminated in the Safety & Security Department and the only nurse with environmental, safety, and regulatory credentials, despite the existence of other positions that could have satisfied any legitimate cost-saving requirement, the company's directives to retain remote workers, and the work being redistributed after Plaintiff's termination, demonstrating the position was not redundant.

36.) The RIF selection process lacked objective, documented criteria or a neutral scoring matrix. Leadership in Plaintiff's direct chain of retaliation- including those responsible for the Restricted Medication Policy, regulatory failures, and retaliation- were allowed to remain in their positions and allowed to make the decisions regarding Plaintiff's termination.

37.) Plaintiff's termination followed closely on the heels of her protected reports to OIG concerning national public safety risks, including the Restricted Medication Policy tied to a prior fatal derailment investigation, and after she had provided extensive documentation of fraud, waste, abuse, and retaliation. The proximity in time, absence of legitimate selection criteria, incongruency between their justification and their own evidence provided to OSHA in Amtrak's Position Statement, and targeting of a whistleblower support a strong inference that Plaintiff's protected activity was not only a contributing factor but the true motivation for Amtrak's decision to terminate her under the guise of a RIF.

# VI. CLAIMS FOR RELIEF

## Count I – Retaliation in Violation of the Federal Rail Safety Act (49 U.S.C. § 20109)

38.) Plaintiff realleges paragraphs 1–34 as if fully set forth herein.

39.) Plaintiff engaged in protected activity under FRSA by reporting safety concerns, regulatory violations, and fraud to her supervisors, Amtrak leadership, Amtrak OIG, Amtrak Board of Directors, and OSHA.

40.) Amtrak knew of Plaintiff's protected activity.

41.) Amtrak took adverse actions against Plaintiff, including issuing a Written Counseling, blocking her promotions, escalating scrutiny and policing of her work and schedule, restricting professional development and networking, isolating and discrediting her, putting her Nursing and Safety professional licenses at risk of legal liability, demoting her job title, intimidating and harassing her to prevent further reporting, punishing associated allies to create a chilling effect and isolate her, and terminating her employment in a purported RIF. Amtrak continued adverse actions after employment by withholding termination paperwork and delayed payment by 8 months for the severance package provided to all employees terminated by RIF

42.) Plaintiff's protected activity was a contributing factor in Amtrak's adverse actions.

43.) Amtrak cannot prove by clear and convincing evidence that it would have taken the same actions in the absence of Plaintiff's protected activity.

44.) As a result, Plaintiff has suffered lost wages and benefits, damage to her career and reputation, emotional distress, and other harms.

# VII. PRAYER FOR RELIEF

45.) WHEREFORE, Plaintiff respectfully requests that the Court enter judgment in her favor and against Defendant and award the following relief:

   a. **Reinstatement/Front Pay**
      Preliminary and permanent injunctive relief, including reinstatement to a position comparable to, or higher than, the position Plaintiff would have attained absent retaliation and career suppression, in a role outside the chain of individuals who participated in the retaliation including the consolidated authority CLO/Chief of HR/Ethics Officer/and Board Secretary, with restoration of seniority, vesting, and benefits; or, in lieu of reinstatement, front pay equivalent to the level Plaintiff would have attained absent retaliation, with anticipated raises, bonuses, and compounding benefits including but not limited to: family health plan, dental, HSA with matching contributions, tuition reimbursement, life insurance, supplemental insurance, vested railroad retirement pension, vested federal pension, 401K contributions and matches, employee perks like parking reimbursement, Amtrak free travel pass, annual free friend and family travel passes, PTO accrued annually, and any other perk or benefit Plaintiff would have had, at the maximum rate legally allowed for a period the Court deems just and equitable.

   b. **Structural/Governance Related Injunctive Relief,** including an order that:

      1. Amtrak remove from any role in employment decisions concerning Plaintiff (including reinstatement, discipline, performance management, development, evaluations, transfer or promotion, or work assignments) any individual identified in this litigation. If the employee named in this litigation has any structural influence over leadership at any level overseeing decisions that affect Plaintiff as described above and cannot be completely removed from those roles, then Plaintiff will report directly to the Amtrak Board, it's subcommittees, or the Board's oversite within the Department of Transportation to ensure retaliation cannot be weaponized or obscured against Plaintiff through the Chain of Command.

      2. Amtrak ensure its whistleblower reporting, investigation, and discipline functions are structured so that no single executive simultaneously controls whistleblower intake, investigation, legal response, and disciplinary authority over the reporting employee; and

23

3. Amtrak designate an independent decision-maker or committee, outside the prior chain of retaliation, to oversee any future employment decisions regarding Plaintiff.

4. Amtrak limit the authority of individuals found to have engaged in retaliatory conduct so that they do not supervise, investigate, or make disciplinary decisions regarding whistleblowing, ethic complaints, or safety reports, and implement structural changes reasonably designed to ensure that regulatory compliance and safety are prioritized, and ensuring FRSA protected activities are not chilled.

5. Appointment of an independent safety and compliance monitor, acceptable to the Court, with a limited term and mandate to: Review Amtrak's handling of whistleblower complaints in the departments at issue, including Legal, HR, Medical Services, Employee Relations, and Amtrak's OIG investigative staff.

6. Amtrak report periodically to the Court (and, as appropriate, to federal regulators) on Amtrak's implementation of FRSA compliant policies and training; and

7. Amtrak review and restructure all policies containing vague, subjective, or overly broad language that can be used as pretext against whistleblowers.

c. **Anti-chilling effect and Isolation Prevention Injunctive Relief**
An order prohibiting Amtrak from retaliating against Plaintiff or any current or former employee who provided information, gave testimony, supported or defended Plaintiff's: protected activity, regulatory compliance, risk, or continuous improvement work that exposed safety risks, now and in the future.

d. **Targeted Injunctive/Structural Relief**
Prospective injunctive relief narrowly tailored to reduce the risk of future retaliation and to protect safety reporting, including that the Court order Amtrak:

1. Provide specialized FRSA and anti-retaliation training to HR, Employee Relations, Legal, Medical Services, Operational Safety, the Board, and Amtrak OIG personnel involved in complaint handling.

2. Maintain an anonymous reporting mechanism that allows employees to track the status of safety and ethics complaints, prohibits HR/ER from unilaterally closing such reports without documented investigation and corrective actions that reduce the risk , does not allow any retaliatory

employee named throughout the evidence of Plaintiff's case to be the investigator or decision maker in those complaints, provides evidence of risk reduction or actions taken to the employee making the complaint (while reasonably protecting sensitive information), and cannot be weaponized against employees by using anonymous complaints that are unfounded.

3. Ensure that any "ethics officer" or internal reporting role for safety or fraud complaints in Plaintiff's case is structurally independent from individuals whose conduct is at issue in this litigation.

4. Develop a standard process of discipline that requires evidence and compliance with employee's rights to due process prior to disciplinary action and includes evidence based corrective action plans that are not subjective or set unreasonable or unobtainable goals for improvement, and provide legitimate support for the employee throughout the duration of the corrective action plan to be successful in improving. Disciplinary matters should not be shared with other employees for any reason and HR is required to ensure it follows all laws and is in accordance with demonstrable policies that are available to all employees and are applied to all employees consistently. In order to develop a fair and equitable system for employees:

   i. HR shall ensure any coaching or disciplinary action is delivered respectfully- free of harassment.

   ii. The evidence of investigation is provided to the employee and the employee was aware of and involved in the investigation before disciplinary measures were taken and provides a written path for reasonable dispute made available to the employee.

   iii. HR shall ensure the discipline is not reasonably related to any safety or security concerns reported, will be expected to override supervisors to ensure all relevant laws are followed, and will be held accountable to approving unlawful disciplinary actions.

   iv. HR will be held accountable to coaching leaders on conflict resolution, critical conversations, and psychological safety for employees to be honest without fear of retribution to develop a culture of continuous improvement, safety reporting, and employee development for success rather than a culture of punishment and punitive actions.

v. HR shall be responsible for encouraging and facilitating effective working relationships before disciplinary actions are taken and recommend the least restrictive measures necessary to improve employee performance. HR shall be accountable to holding leadership and supervisors accountable to the same policies that all employees are held to, that all policies are consistently applied, and made publicly available within the company for all employees to review. There will be no secret policies attached to other mechanisms that the employee unwittingly consents to without full disclosure of what they are agreeing to.

vi. Promotion or lateral transfer bans will not be applied to employee development or disciplinary actions unless the employee is currently and actively on a PIP, to allow the employee to be more successful in a different application of their skills or working group and benefit the Defendant in maintaining a talent pipeline and culture that empowers employees to be successful rather than punitive. If the employee successfully completes the PIP, then any restrictions on promotion or transfers will be removed and the employee will not be continuously punished despite successfully completing the PIP.

**e. Non-Interference and Anti-Blacklisting Relief,** including an order that:

1. Defendant shall not retaliate against Plaintiff, or interfere with her future employment, assigned work, projects, professional development, or professional relationships, based on:

    i. Subjective "errors" or vague "quality standards"

    ii. Her lawful association with colleagues, mentors, or future supervisors

    iii. Vague or unsupported allegations about the "appearance" of a conflict of interest

    iv. Vague or unsupported allegations about "disturbing the harmony of the group"

    v. Anonymous "complaints"

    vi. Unreasonable "budget issues" without evidence

      *vii.*   Vague "travel restrictions" that do not apply to the rest of the company

      *viii.*  Weaponizing the chain of command to stall or delay projects or resources

      *ix.*   Weaponizing "out of scope", "unauthorized", "too complicated", or other subjective or demonstrably false statements to stall Plaintiff's work, assert retroactive retaliation, or limit Plaintiff's ability for professional development.

      *x.*   Limiting tools, resources, or knowledge application that Plaintiff has or is applying to her work to prevent or hinder Plaintiff's credibility, visibility, or success.

2. Defendant shall not weaponize policy interpretation, investigations, or discipline, increase surveillance, apply excessive burdens or workloads, harass, intimidate, tolerate hostile behavior or ostracization, or take any other pretextual or retaliatory actions against Plaintiff and anyone who was associated with publicly supporting Plaintiff and her protected activity to socially isolate Plaintiff, and to chill whistleblowing and dissent.

3. Defendant shall not Interfere with, or prejudice, or prevent in any way, Plaintiff's ability to be considered for professional advancement based on her skills, achievements, experience, and education.

4. Defendant shall not require Plaintiff to report her internal job applications and request prior approval by her direct supervisor before interview and final selection from the candidate pool, that would give Amtrak leadership ability to suppress and discredit Plaintiff.

5. Defendant shall not interfere with Plaintiff's ability to participate in professional development or networking opportunities related to any topics listed under section (h) of this complaint; to isolate, suppress advancement, or discredit Plaintiff.

6. Defendant shall financially support ongoing development opportunities to maintain both her nursing and safety licenses requirements as outlined by the respective accredited licensing boards applicable to those licenses.

7. Defendant shall not restrict Plaintiff's ability to travel unnecessarily to prevent networking, learning the functions of the business as a whole, or advancement opportunities, including with other leadership, other departments, and senior or executive leadership.

8. Any investigation concerning Plaintiff shall:
Be reviewed by an independent, neutral decision maker outside of Amtrak and must provide sufficient evidence to substantiate any allegations that must be supported by objective policy violation.

9. Any actions taken by the Defendant against Plaintiff after neutral third-party investigation and substantiated evidence must:

    i. include evidence that the policy violated has been consistently applied to other employees in her department or peer group

    ii. reasonable steps have been taken to ensure understanding of the policy before punitive actions are taken

    iii. informal conversations have been tried first and does not assume the outcome up front

    iv. all parties involved have been named and mediation between the named parties has occurred with an unbiased and competent mediator

    v. is the least punitive action necessary to remediate the issue

    vi. is for the purposes of performance development and not punitive

    vii. is not related to any misunderstandings or lack of knowledge either known or withheld with Plaintiff

    viii. provides the evidence of such actions to Plaintiff and opportunity to respond in writing

    ix. is supported by a clearly defined and reasonable action plan that does not place Plaintiff in a situation that would be unreasonable to expect success with improvement by using unrealistic expectations

    x. not include retroactive discipline for informal conversations

28

     xi.    notify Plaintiff in writing of any changes to her personnel file without requiring specific request from the Plaintiff

**f. Back Pay and Benefits**

Back pay with pre and post judgment interest, and restoration of lost benefits, including compounded retirement contribution with match equivalent to the contribution levels allowable by the position level the Plaintiff would have obtained absent retaliation, and other fringe benefits including but not limited to pensions and vesting credits, tuition reimbursement, HSA contributions and match and medical and life insurances, fully accrued PTO, and any other benefit or perk the Plaintiff has been deprived of, to the fullest extend allowed by law.

**g. Compensatory and Punitive Damages**

Compensatory damages for emotional distress, loss of professional reputation, ongoing professional license jeopardy, loss of career opportunities and advancement, loss of mentoring and professional development opportunities caused by Defendant's interference with Plaintiff's professional relationships and networking, financial and personal hardships caused by Amtrak's conduct, including but not limited to: depletion of savings, withdrawal of retirement funds, and the ongoing inability to secure comparable employment. Additionally, punitive damages in an amount sufficient to deter repeated willful or reckless disregard of federal safety, public safety, and whistleblower protections, up to the maximum amount allowed under 49 U.S.C. § 20109 and other applicable law.

**h. Reputational and Professional Rehabilitation**

An order directing Defendant to not oppose, interfere, or undermine her efforts to obtain appropriate third party advisory board roles and take reasonable affirmative steps to repair Plaintiff's professional reputation and development, including:

Requiring Amtrak to provide Plaintiff with one or more written letters of professional reference, on official letterhead from the Amtrak Board recommending her and describing her experience and accomplishments related to several of the following:

     *i.*    Risk Management,

     *ii.*    Regulatory Compliance,

     *iii.*    System Safety,

     *iv.*    Data Analytics,

29

  *v.* Digital Design and Innovation,

  *vi.* Continuous Improvement,

  *vii.* Transformation,

  *viii.* Leadership,

suitable for use with prospective employers, professional organizations, and board applications including but not limited to transportation/transit/railroad associations, safety associations, continuous improvement associations, digital innovation associations, regulatory, safety, and standard bodies.

**i. Conference and Professional Development Support**
An order requiring Amtrak to reimburse reasonable costs for Plaintiff to attend professional conferences and trainings necessary to maintain and rebuild her Registered Nurse and Certified Safety Professional credentials and relevant career paths related to transformation, continuous improvement, railroad industry, data analytics, leadership, risk management, system safety, regulatory compliance, or IT.

**j. Safety/Policy – Correction Injunctive Relief**
Injunctive relief requiring Defendant to correct unsafe policies and practices Plaintiff reported- including, but not limited to, the Restricted Medication Policy, DOT exam procedures, unlocked/alterable medical and regulatory records, and deficient safety programs- and to implement safeguards that protect employees who raise safety concerns, with ongoing monitoring or auditing to ensure good-faith implementation, with evidence supporting actions, risk mitigation, and closure of all reports.

**k. Expungement and Protection of Professional Licenses**

 1. Issue a written statement on company letterhead, signed by an appropriate executive, confirming that the:

  **a.** Unlocked and editable nature of the medical and exam documentation, and medical document storage systems during the relevant period prevents any reliable attribution of later changes to Plaintiff, so that her nursing license, safety license, and professional reputation are not unfairly jeopardized by records Amtrak permitted others to alter.

30

2. Place that statement in Plaintiff's personnel file and, upon Plaintiff's written request, provide a copy to any nursing licensing board, credentialing entity, or to Plaintiff directly.

3. Agree not to assert, in any future licensing, employment, or related proceeding, that Plaintiff falsified or mishandled those regulatory or medical records or clinical assessments based solely on records she did not control, and to reasonably cooperate in defending Plaintiff if those records are used against her.

4. Expunge all retaliatory discipline, including the February 14th, 2025 written counseling and any related negative notations, from Plaintiff's personnel file, including reports that suggest negligence or misconduct by Plaintiff arising from the retaliatory investigations and to take reasonable affirmative steps to repair Plaintiff's professional reputation.

l. **Fees and Costs**
An award of reasonable attorney's fees, expert fees, and litigation costs incurred in this action, as provided by 49 U.S.C. § 20109 and other applicable statutes, including fees incurred to secure new counsel after prior counsel withdrew while Plaintiff remained unrepresented and Amtrak continued to stall and delay mediation.

l. **Intellectual Property Protection/Work Attribution**
An order that Amtrak may not represent Plaintiff's provisionally patented RISE Ecosystem tools, frameworks, modules, screenshots, algorithms, developer guides, white papers, live demos or any substantive derivatives as work having been developed by others, that any continued internal use must attribute authorship to Plaintiff, and its development and implementation at Amtrak is conditioned on a negotiated license or settlement agreement.

n. **Other Just and Proper Relief**
Such other and further legal or equitable relief as the Court deems just and proper.

o. **DEMAND FOR JURY TRIAL**
Plaintiff demands a trial by jury on all issues so triable.

---

Dated: 12/29 , 2025

Respectfully submitted,

*Jessica Carson*

Jessica Carson- Pro Se Plaintiff

31

902 State St
Osage, IA 50461
Phone: 641-330-1987
Email: jessicalynncarson1234@gmail.com