Jessica Carson
902 State St
Osage, IA
641-330-1987
jessicalynncarson1234@gmail.com



RECEIVED
OVER THE COUNTER

DEC 3 1 2025

United States District Court
Northern District of Iowa

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

JESSICA CARSON,

Plaintiff,

v.

NATIONAL RAILROAD PASSENGER
CORPORATION (AMTRAK), et al.,

Defendant.

Civil Action No. _____

**DECLARATION OF JESSICA CARSON IN SUPPORT OF COMPLAINT AND MOTION
FOR PRELIMINARY INJUNCTION**

I, Jessica Carson, declare under penalty of perjury that the following is true and
correct based on my personal knowledge, except where stated on information
and belief. If called as a witness, I could and would testify competently to the
matters stated herein.

# 1. Exhibit 1- Events Timeline (Summary of Events and Evidence)

1) Attached as Exhibit 1 is a document titled "Events Timeline". I created Exhibit 1 to summarize, in chronological order, the protected activities I engaged in, the retaliatory actions that followed, and the related evidence.

2) The Exhibit 1-"Events Timeline" is based on (a) my personal knowledge of events I experienced observed, or participated in; and (b) my review of records including emails, internal messages, work product, meeting materials, performance documents, public documents, and other business records that I sent, received, created, or reviewed in connection with my work and subsequent complaints.

3) Each "Events Timeline" entry identifies the supporting evidence for that entry if one exists, by exhibit reference. The "Events Timeline" is intended as a summary and navigation tool for the Court; the supporting documents themselves are attached as exhibits and speak for themselves.

4) Exhibit 1- "Events Timeline" is a true and accurate summary of the events described to the best of my knowledge.

# 2. Foundation for Attached Exhibits

5) The exhibits attached to my filings are true and correct copies of documents they purport to be, including emails and attachments I sent or received, internal communications, work product I created, and records provided to me or maintained by me in the course of my work and subsequent complaints.

6) To the extent any exhibit contains redactions, I made those redactions only to protect personal identifiers or sensitive information, and not to alter the substantive meaning of the document.

## 3. Incorporation by Reference

7) Because (*Exhibit 1- Events Timeline*) contains detailed chronological descriptions and cross-references to supporting evidence, I do not repeat every event in full here. Instead, I summarize the key facts necessary for emergency relief below and incorporate (*Exhibit 1-Events Timeline*) by reference for additional detail.

## 4. Corroborating Witness Declaration (Lisa Stott)

8) In support of this motion, Plaintiff submits the Declaration of Lisa Stott, BSN, RN, attached as (*Exhibit L*). Ms. Stott is a former Amtrak Senior Occupational Health Nurse who worked in Medical Services and has direct personal knowledge of the same reporting systems, workflow conditions, and management practices in this case. Ms. Stott attests to her own safety/compliance reports and related communications, and to retaliation and suppression patterns consistent with Plaintiff's experience, including:

   a. Joanne Norman, Amtrak Legal Compliance Officer investigating Plaintiff's formal near miss reports with Ms. Stotts on April 22, 2025, despite no investigation with the Plaintiff. This investigation occurred two days after Plaintiff reported risks of engineers able to operate passenger trains while taking methadone to the Amtrak OIG, and weeks before Joanne Norman sent an email to Plaintiff stating OIG found "no fraud, waste, or abuse" and didn't pursue an investigation, sent the night before Plaintiff's termination notice, stating Plaintiff's reports "just made their way to her desk".

   b. Mischaracterizing Ms. Stott's protected activity as insubordination by Amy Milhorn-Senior Nurse Manager, the same pattern of retaliation and pretext used in Plaintiff's case and written counseling;

c. A report of procedural entrapment issues regarding a DOT exam and methadone use of an employee that was the basis of a fraudulent written counseling against Plaintiff, validated as scapegoating by Ms. Stott.;

d. A formal complaint to Adria Boetig, Employee Relations Senior Investigator attorney, and Robert Grasty, SVP of HR (former) on March 9th, 2025, regarding harassment and retaliation she experienced after defending Plaintiff for her advocacy against an unlicensed coordinator trying to override the nurse in returning a safety sensitive employee to work without enough information to make a fitness for duty decision.

e. Ms. Stott's own formal near miss safety reports in Amtrak's voluntary reporting system that matched many of the same concerns Plaintiff reported and were forwarded to Employee Relations to investigate, who forwarded them to Human Resources who harassed and intimidated her instead of investigating, and closed the near miss reports in the Amtrak Voluntary Reporting System without actual investigation, leaving the safety and security risks unaddressed.

f. Ms. Stott's initial report to OSHA, regarding her own protected activity and surrounding retaliation, her concerns for the retaliation she experienced by Dr. Ann Kuhnen, Amy Milhorn, Senior Safety Manager, and her validation of witnessing retaliation against Plaintiff for her safety concerns.

# 5. Background and Professional Role

9) I am a licensed Registered Nurse and Certified Safety Professional with extensive expertise in occupational health, safety, compliance systems, continuous improvement, and national-level risk management.

10) My career began as Director of Nursing, Director of Nursing Therapies, ER Charge Nurse at a level 4 trauma facility where I then transitioned out of the medical industry into Occupational Health and Safety, working as the Site Safety and Health lead at Zoetis/A10- a global biopharmaceutical manufacturer that houses live viruses to make immunizations- in Charles City, IA. I led through a transformation with ergonomics, continuous improvement, fitness for duty, industrial hygiene, regulatory compliance, and safety, with our site achieving OSHA VPP Star Award Status. I trained emergency response and extraction crews and built programs to support their near miss reporting and safety systems. I then continued Occupational Health and Safety into the railroad industry at Union Pacific Railroad, where I built corrective action plans, managed three clinics across 5 states, built national safety and health programs, became a continuous improvement practitioner and certified case manager, coached executives and managers on injury response and prevention and worked with the legal and risk management teams to manage through those work-related injury claims to ensure quality care. I worked for multiple doctors at UP, who have literally wrote the book on the gold standards in Occupational Medicine. I spent an incredible amount of time by the tracks, on trains, in depots, mechanical and engineering shops, and every sector of railroad operations. I have seen first-hand the consequences of work-related injuries and illnesses, both on the job and in the Emergency Room. I learned the railroad industry is inherently dangerous, knowing employees who leave their house in the morning and never come home to their loved ones again. I've cried with the families that bear the impact of losing those loved ones. I've sat in crew rooms with thousands of fellow railroaders across five states listening to their personal stories, talking them into taking caring of themselves, and witnessing how upstream complacency and lack of leadership accountability translates into downstream injuries and fatalities. I was inspired to further my education in safety and risk management with a deep love for the railroad industry. I worked full time, raised my children as a single mother full time, and went to school full time for a bachelor's degree in Environmental, Safety, and Risk Management. I became a Certified Safety Professional, which is no small feat by any measure.

11) Prior to my termination, I held a strategic position at Amtrak contributing to fitness for duty clinical assessments, national safety initiatives, regulatory risk mitigation, continuous improvement, and designed innovative safety

management systems by working collaboratively across many silos in passenger rail, while working remotely from home in Osage, Iowa.

12) My career path and combination of expert skills is non-linear and unique, is what creates my value, and why Amtrak was using me to rebuild nation-wide regulatory programs on top of performing my role as Senior Occupational Health Nurse. Not only did I find significant compliance and safety risks through advanced risk and data analysis, I spent a significant amount of time outside of work to develop viable solutions for them using tools of continuous improvement and digital technology. It is those very skills exposes weak, insecure leadership to feel threatened and double down on protecting a system that protects their incompetence-at all costs, even as they transfer risk downstream to frontline employees and passengers.

13) I had positive performance evaluations, no discipline, and even received a Tier Award for my work on the compliance programs prior to a heavy period of protected activity and ensuing retaliation. My work was innovative and threatening enough that they co-opted my work without attribution and cut me out of it after advocating for safety and questioning processes and leadership behaviors that undermine it. I was networking with a group of senior directors who were seeking my skills and actively recruiting me outside of the Medical Services Department when I was terminated under the guise of a Reduction in Force and labeled "redundant" by the very leadership I questioned.

## 5. Employer Knowledge

14) Amtrak, through its managers and executives, had actual knowledge of my protected activity. I reported directly to my immediate supervisors in Medical Services and to the Medical Director; to executive leadership including the SVP of Safety and Security Department, the SVP of HR, the SVP of Employee Relations; to HR Business Partners; to the Amtrak OIG; and to the Amtrak Board of Directors and CLO who had also replaced the SVP of HR Plaintiff reported to, was Board Secretary, and also Amtrak's Ethics Officer. Plaintiff

used the very channels Amtrak promoted for reporting safety concerns, fraud, waste, and abuse.

15) On February 19, 2025, Plaintiff provided a "Supporting Evidence Document" with hyperlinked sub-documents as evidence to the Senior Vice President of HR and the Senior Vice President of Safety and Security, summarizing my safety concerns and attaching evidence of chart tampering, lack of due process and gross mismanagement and misuse of the disciplinary process by HR allowing a demonstrably fraudulent written discipline, Restricted Medication Policy risks, unlocked medical records, retaliation, inconsistent policy application, and DOT Exam process misuse.

16) On February 23, 2025, I submitted 3 formal near miss/safety reports through Amtrak's Voluntary Reporting System.

17) On February 25, 2025, I emailed a follow up and additional safety reports to Employee Relations VP and Sr. Investigations Manager after no confirmation of the transfer the SVP of HR stated would happen between him and Employee Relations, for the purposes of an "unbiased" investigation".

18) On March 3, 2025, Employee Relations leadership, including the VP of Employee Relations and the assigned investigator, received the same evidence via SharePoint links, along with Plaintiff's written explanation of the retaliation and safety risks.)

19) On March 10th, 2025, I reported concern for critical safety risks including fraud, retaliation, regulatory safety risks, and selective policy application during a 1.5 hour retaliatory meeting with another HRBP.

20) On March 20th, Amtrak Employee Relations was notified of My's OIG submission, and by early April, 2025, OIG had conducted a detailed 1.5 hour interview. Amtrak OIG and Amtrak HR and Legal were therefore aware that I had made formal protected reports to both internal and external oversight bodies prior to the adverse actions challenged in this Complaint.

21) On May 12, 2025, I notified Amtrak Board, President and Chief Legal Officer of dangerous safety concerns to employees and passengers regarding the Restricted Medication Policy and the use of methadone in safety sensitive workers despite a multiagency investigation into a 2019 fatal derailment with

2 fatalities and 36 injuries relating to controlled substances and Drug and Alcohol Program deficiencies, and other safety risks including:

a. The Restricted Medication Policy allows safety sensitive employee to take fentanyl and morphine 12 hours before their work shift, with no way to verify whether they are taking it 12 hours before or during their actual shift.

b. Gaps between periodical physical examination processes and the Drug and Alcohol Program create risk for employees to never have a random drug test or even be pulled out of service if tested and found positive.

c. 40-50% compliance rate with required training and annual audiogram testing after using My's corrective action plan work to pass a FRA audit, removing me from the project, and failing to implement the corrective action plans they used to pass to FRA audit, and still lacking basic compliance over a year later.

d. Lack of protection and disposal while handling biohazards for employees on passenger trains, creating risk for blood born pathogen exposure

e. Leadership obstruction in compliance with federally regulated compliance programs.

f. Systemic, patterned, coordinated suppression and retaliation against a whistleblower.

*(Detailed events and evidence described in **Exhibit 1**- Event Timeline, with cross referenced exhibits by event)*

# 6. Retaliation for Protected Activity

22) Over the course of my employment, I engaged in protected activity by reporting systemic safety failures, regulatory noncompliance, selective application of the return to work policies, unlocked and editable regulatory exam charts, bloodborne pathogen program gaps, hearing conservation program gaps, misuse of the DOT exam process, fraudulent editing of regulatory exam records I had charted, unsafe restricted medication policy, abuse of the Drug and Alcohol process, and ethical misconduct to internal leadership, Employee Relations, Executive Leadership, to the Amtrak Office of Inspector General (OIG), OSHA, and the Board of Amtrak.

23) Following these reports, I faced escalating, coordinated, systemic retaliation. Leadership falsely characterized me as insubordinate, misrepresented my conduct, reassigned my innovation work to others, and subjected me to a 12-month promotion ban with no policy basis.

24) While delivering the written counseling, my direct supervisor said, " I should have taken care of you on day one!" while HR watched and did nothing. I was deprived of due process or a legitimate plan for improving performance other than, "you can figure it out", and "you'll go by, by".

25) My job title was demoted, I was scrutinized, shamed, humiliated, required to agree to be recorded, harassed, and ostracized in group chats. I was intimidated, gaslit, lied to, and handed back to the very people I reported, by the very people who are meant to be Amtrak's oversite in accountability.

26) Ultimately, I was wrongfully terminated under the guise of a Reduction in Force and retaliation did not end there. My severance package was withheld, unused PTO payout was delayed, unemployment verification was delayed, and after Amtrak asked for a global settlement - including a fellow nurse and whistleblower- Amtrak:

   a) Refused several mediators including a nationally recognized mediator and a retired federal judge.

      **b)** Asked to set up dates with the original mediator they turned down, to be scheduled in February 2026, which is 6 months after they originally asked to settle and 10 months after I was terminated, and have yet to make any kind of basic offer.

27) After losing our legal counsel, who no longer had the resources to service the scope of this case, I reached out directly to Amtrak's counsel and board to negotiate in good faith. I informed them that I am protecting my rights by filing in federal court, having reached constructive exhaustion. I offered a win-win solution that would provide them the very initiatives they are advertising publicly as someone uniquely qualified to provide them all of those things and offered to allow them to control the public narrative as part of settlement, and asked them to make an offer for review.

28) Amtrak refused to engage, then spent the next few days updating a significant number of whistleblower related policies and implementing an anonymous ethics reporting line while leaving the same backend retaliatory structure in place. They changed the front door, but the room is the same.

29) Amtrak leaders made public statements such as "safety is not negotiable" and "no one should pay the price for doing the right thing", while leaving two whistleblowers who did the right thing to protect safety, unemployed for 6 months and financially destroyed during the holidays.

30) This is a long and predictable pattern of optical management while failing to correct underlying risks and continues to put whistleblowers and anyone who's skills threaten insecure management, of ongoing retaliation and a perverse imbalance of power.

31) Adverse actions against me include but are not limited to:

      **a)** Issuing a February 14, 2025 retaliatory Written Counseling that was factually inaccurate and pretextual, with a twelve-month promotion ban unsupported by any policy, disproportionate to a first time warning, and fraudulently reframed my protected activity as "insubordination". The written discipline cited Me for

"negligence" for following the policy exactly as the same leadership who was disciplining me had written, and for creating "potential risk" while the same leadership ignored their role in creating. The written discipline abused the authority of the Code of Conduct policy to charge me with "disturbing the harmony of the group" by using the words "chastised" and "nursing judgement", even as those words were used during protected activity.

b) Editing and undermining the integrity of regulatory exam records associated with the very safety concerns I had reported, including tampering with my 2023 regulatory record and 2024 regulatory exam record in close proximity to the Written Counseling.

c) Amtrak, acting through its managers and decision-makers, engaged in a coordinated and systemic campaign of retaliation against Me, demonstrating reckless disregard for whistleblower protections and for the safety of employees and passengers, including but not limited to the following actions:

   i. Isolating and restricting Me from professional networking opportunities, travel, and developmental opportunities;

   ii. Restricting projects and scope;

   iii. Obstructing progress of projects and regulatory compliance by weaponizing chain of command delays;

   iv. Removing me from continuous improvement work that would improve process efficiency, and identify and mitigate compliance gaps ;

   v. Interfering in relationships between Myself and other leadership including my professional mentorship;

vi.     Targeting of anyone who showed professional support for Me including fellow nurses, mentors, operational safety staff, and occupational safety staff;

vii.    Co-opting and reassigning my work and innovation to senior leadership without credit;

viii.   Claiming I was redundant to justify RIF then posting roles to co-opt the work and innovation they blocked me from;

ix.     Senior Safety Leadership blocking free scalable solutions I was already building to satisfy regulatory compliance gaps in the national Blood-borne Pathogen Exposure Control Program, claiming "budget issues" and preference for paper forms over digital;

x.      Publicly belittling, humiliating, and marginalizing Me;

xi.     Soliciting medical coordinators to monitor and report to leadership any mistake or minor error I made, directly to leadership while circumventing Me and simultaneously creating excessive workload with no additional pay;

xii.    Assigning additional program work in regulatory compliance, then obstructing My's efforts in fixing regulatory compliance to avoid spending money on immunizations or PPE that protect employees;

xiii.   Assigning additional program work that allowed them to pay one worker's wage for the work of two safety professionals in separate departments, then refusing to provide any dedicated time to work on the additional assigned work during work hours which caused Me to work nights and weekends for months on end to complete core Medical Services work while rebuilding national regulatory compliance programs, and then

tried to move the project timeline up from 5 months to 2 weeks when they were unsuccessful in sabotaging Me;

xiv. Weaponizing subjective words, vague complaints, anonymous complaints, and vague policy interpretation against me while ignoring the underlying safety concerns;

xv. Tolerating coordinated group hostility, ostracism, and racially charged statements towards Me in Teams meetings and group chats without intervention;

xvi. Misrepresenting facts to OSHA and federal government stating Amtrak received no evidence of protected activity and that I made vague reports that didn't qualify as protected activity;

xvii. Coordination between Amtrak Legal and Amtrak OIG in a manner that buried my whistleblower reports, abdicated their duty to protect a whistleblower, and evaded oversight;

xviii. Citing non-existing policy to justify a 12 month promotion ban and claiming there is no progressive management disciplinary policy despite one existing, and that employees can be disciplined at any time retroactively without informing the employee or documenting it on their performance plan to review or sign;

xix. Employee Relations, HR, and Legal running superficial and biased investigations that were procedurally improper and designed to avoid accountability of leadership through tactics such as investigating the whistleblower instead of the whistleblower's safety reports, harassing and intimidating Me for hours on subjective word choice and refusing to discuss the serious safety risks the investigation was scheduled for;

xx.   Mischaracterizing Amtrak's personal legal counsel as "independent and neutral third party" to investigate the me;

xxi.   Terminating the SVP of HR and centralizing all authority under the Chief Legal Officer to also act as Chief of HR, Corporate Ethics Officer, and Board Secretary, creating a governance structure that controls the investigation, discipline, termination, and silent erasure of whistleblower;

xxii.   Closed near miss/safety reports through the formal voluntary safety reporting system as investigated, while neither investigating the risks or mitigating the risks despite the serious risks to employees and passengers, undermining the integrity of Amtrak's Voluntary Safety Reporting System

*(Detailed events and evidence described in **Exhibit 1**- Event Timeline, with cross referenced exhibits by event)*

d)   Demoting My's job title from Senior Occupational health Nurse to lead Nurse on or about February 25, 2025, just two days after I submitted formal near-miss reports through the Voluntary Reporting System documenting safety concerns.

e)   Terminating My's employment on May 6, 2025, in a purported reduction -in-force that eliminated only six employees in the entire Safety & Security Department that included hundreds of employees, including Me, despite the availability of more logical, less retaliatory choices to meet any claimed cost-saving directive. Then, redistributed my work to the remaining two nurses in the same position I was employed in. No paperwork or email was provided regarding reason for termination to me, despite confirming my address, phone number, and email address while terminating me, telling me I would receive that documentation and severance package between 24-48 hours after the meeting. The justification that

the AVP of EHS gave while informing Me through a Teams meeting, was "budget" and "cost savings measure".

**f)** Engaging in continuing post-termination retaliation, including:

 *i.* Withholding severance provided to other RIF-affected employees by policy, for 8 months, until I provided notice of intent to file in Federal Court for emergency injunctive relief.

 *ii.* Delaying unemployment verification and payment of unused PTO

 *iii.* Refusing to meaningfully engage in settlement discussions, refusing neutral mediators, and delaying mediation for 6 months after Amtrak requested private global settlement with myself and fellow Amtrak nurse, Lisa Stott, who also has a case docketed with OSHA against Amtrak for similar complaints;

 *iv.* Refusing to fulfill FOIA requests

*(Detailed events and evidence described in **Exhibit 1**- Event Timeline, with cross referenced exhibits by event)*

**g)** On May 6, 2025, Amtrak selected me for termination in a purported reduction-in-force. I was one of only six employees terminated in the Safety & Security Department and the only nurse with environmental, safety, and regulatory credentials, despite the existence of other positions that could have satisfied any legitimate cost-saving requirement.

 i. The RIF selection process lacked objective, documented criteria or a neutral scoring matrix. Leadership in my direct chain of retaliation- including those responsible for the Restricted Medication Policy, regulatory failures, and

retaliation- were allowed to remain in their positions and allowed to make the decisions regarding my termination.

ii. My termination followed closely on the heels of my protected reports to OIG concerning national public safety risks, including the Restricted Medication Policy tied to a prior fatal derailment investigation, and after I had provided extensive documentation of fraud, waste, abuse, and retaliation. The proximity in time, absence of legitimate selection criteria, incongruency between their justification and their own evidence provided to OSHA in Amtrak's Position Statement, and targeting of a whistleblower support a strong inference that my protected activity was not only a contributing factor but the true motivation for Amtrak's decision to terminate me under the guise of a RIF.

*(See **Exhibit 109**- "Amtrak Position Statement + Exhibits, and **Exhibit 110**- Jessica Rebuttal to Position Statement)*

# 7. Career Suppression and Financial Harm

32) These retaliatory actions have caused profound and irreparable harm to my professional standing, income, and future prospects. Despite strong performance evaluations, leadership suppressed my promotion, cut off high-impact projects I initiated, and sought to portray me as a poor performer, working out of scope for projects they asked me to work on, redundant, difficult to work with, and incompetent.

33) I was removed from continuous improvement work I designed, while they co-opted my work, blocked me from leaders who found it credible, reappropriated my work and credibility to senior leadership to then implement it without me and failed to deliver any results regardless.

34) They refused to even interview me, with a rejection within an hour, for a Director of Occupational Safety role that I am extremely qualified for and was already doing the work of at their request, in rebuilding the national regulatory programs. The harm is never being able to advance or increase my wages or be able to build a retirement for myself as a single woman. The unjust enrichment from my work and career suppression impact more than just who gets credit. It is my livelihood, stability, retirement plan, and safety that has been taken from me.

35) I've been unemployed since May 6, 2025. Despite submitting approximately sixty-seven job applications in occupational health, safety, continuous improvement, regulatory compliance, program management, transformation, and related fields, I have received only one interview and has never been advised of any outcome or offered a position with that company since July. Osage, Iowa is a very rural area and there are no jobs even remotely close to the pay and benefits I was receiving at Amtrak, where I worked remotely, with a railroad pension, a federal pension, and all other federal benefits. Even the largest of employers in North Iowa do not provide anything comparable. And occupational health nursing in and of itself is rare and niche. Having a non-linear career path causes most employers to shy away from my resume and my particular combination of skills is even rarer yet. That is why my work and networking with senior leadership who was trying to position me for advancement to utilize those skills is so important. It would have provided the official titles and status to be able to obtain work that aligns with my skillset, outside of only occupational health. It would have increased my earning potential and value significantly, just to move out of nursing positions that continue to pigeon hole me.

36) I receive unemployment benefits through the Railroad Retirement Board in the approximate amount of $990 every two weeks. Those benefits are nearing the end of their eligibility period and are not sufficient to cover all of my basic monthly expenses. I'm a single woman with no spouse or partner to assist with support. I had $2,530.97 in my account (every single last dollar I had), when Amtrak deposited $4,647.97 as my owed severance paid 8 months late. Although I will be able to pay January bills and most of February and I am relieved to have it, it still doesn't protect my stability with $0 in savings and no assets to liquidate. And none of the amounts calculated for January and February bills include budgeting for groceries, gas, household

essentials, or medicines. And it does not restore my ability to support myself in retirement as a single woman, provide medical insurance for my kids, and did not provide enough money to be able to buy Christmas presents this year, despite it being deposited on December 23.

37) After my termination, I was forced to cash out my Amtrak 401(k) account, which yielded approximately $12,000 after taxes. I had previously been required to cash out my Union Pacific 401(k) when a significant portion of my department was eliminated four years earlier, as part of a broad restructuring and eventual elimination of the department entirely. It took me over a year and hundreds of job applications to obtain the Amtrak role at issue in this case. I have now exhausted those retirement funds and my entire savings. I was counting on the railroad retirement pension, the federal pension, and the 401K to make up for the inability to maintain retirement savings in attempt to survive and take care of my children.

38) I was married for thirteen years in an abusive marriage and have been the sole financial provider for my two children since 2013 when I obtained my job at Union Pacific and could afford to support my children on my own financially, while also providing all health benefits for them. My children are very young adults and trying to get on their feet, struggling with money themselves, even as they work very hard to be independent. They don't ask for much, and they maintain their own employment and housing and stable employment, but they were covered under my Amtrak health insurance. That coverage ended with my termination, and my son has been without healthcare or dental insurance since. Additionally, young adults can work and go to college and pay for it themselves as I did, but it still requires support and assistance and in a variety of different ways to allow them to be successful in having reliable transportation to get there, gas money, out of pocket books expenses, meals, etc. They have chosen to work full time and that's ok, but I should also not be in a position that currently prevents me from assisting them when they decide to go and don't have to worry about taking care of their mother.

# 8. Emotional and Psychological Impact

39) The experience of being targeted, isolated, and ultimately terminated for doing the right thing has taken a significant toll on my mental health. I have faced extreme stress, anxiety, grief, frequent bouts of uncontrollable crying—not only due to the career loss but because I was actively working to protect Amtrak and the public. The betrayal by leadership, after pouring myself into reform efforts, innovation, and corrective risk mitigation plans that they co-opted and were unjustly enriched from, has left lasting trauma. I have struggled with despair, fear for my future, and deep emotional pain. My support systems were limited, I was isolated in every possible way, made to feel hated and unwanted for protecting employee safety, and my termination severed access to allies and professional networks that were the last emotional life raft in my daily battle to survive.

40) Being a railroader is more than a profession; it is an identity and way of life that I have lived for 8 years now, with my brother a conductor in freight rail and my son aspiring to work in the railroad industry. My father rotates jackets he wears with our individual railroad logos on them just so he can tell anyone who asks about his kids working for the railroad. It is rare in our area and always generates questions. I now have lost my identity, financial security, self-esteem, and my emotional support system as a single woman living alone after successfully launching my two children after graduation, stability for myself and young adult children, and ironically my own safety, to protect the safety of employees and passengers. Some people want vacations and nice houses....I just want to feel safe.

41) Rather than utilizing my skills to help them improve or simply fix the problems I was already providing solutions for, Amtrak sought to eradicate me at every level. When presented with substantial amounts of evidence proving serious national safety risks and retaliation, they chose to retain the same leadership that retaliated against me with no accountability. Not only did Amtrak retain that leadership, they celebrated them. This is a significant moral wound in trying to reconcile if employee safety and my own worth are of less value than those photo ops. It leaves me sleepless, worried about the safety of current and future employees who find out the hard way that Amtrak's system is designed to punish and eliminate people who speak up or professionally dissent in any way. Even their code of conduct has a loophole in it to burry whistleblowers, "you maintain the harmony of the group" and therefore cannot dissent, are mobbed by anyone looking to hurt

you or threatened by your skills and claim you disturbed their harmony. Speak-up culture and psychological safety to bring up concerns takes courage. It's not about maintaining everyone's comfort, it's about knowing you won't get disciplined or be exterminated for bringing up uncomfortable truths about safety that people want to ignore. You can't even apply for another position in the company without your supervisor's approval first. The same people who retaliate against you and want to discredit you, get to decide your entire future. It is a perverse inversion of justice. There's no way to escape the structures in place designed to bury whistleblowers. I legitimately get sick thinking about how many people have suffered through this system without the knowledge to defend themselves and how many workers or passengers have been injured in that culture. Maybe it would be easier to just walk away and forget it, but I have spent my entire career protecting people and taking care of them in one way or another, and I cannot lay my head on my pillow at night knowing I didn't don't do everything I could to make sure this does not happen to anyone else again.

42) The stigma of being a whistleblower is an ominous trauma in and of itself. I do at times find myself unable to get out of bed and it's all I can do to brush my hair or eat. Other days I overeat and cry, and overeat, and cry. Some days I can function and utilize them to be productive in applying for jobs, trying to increase my value, or trying to be my own lawyer. Some days I can visit with my kids or put a smile on and face the world, but there are never any days that don't end with me feeling hopeless, alone, and afraid. The pain of feeling like you died and no one came to your funeral is excruciating. My entire life has been put on hold until I am no longer radioactive, and once I'm not, I'll be starting all over trying desperately to dig myself out of the same hole I just climbed out of.

43) It has caused significant harm to the relationships I had before this extraordinary hell I have been through and leaves me feeling further isolated. People who supported me openly have all experienced retaliation for doing so and I'm afraid to develop relationships with anyone else for fear that they will become the next targets for associating with me.

44) Every system and agency meant to detect and prevent these issues has not only failed me, but they enabled and shielded Amtrak's weaponization of the systems and people they are supposed to protect. These thoughts have

overwhelmed me, significantly impacting my ability to trust anyone, to feel safe, or that my voice matters to anyone. Interim relief is the first step in healing by ensuring my voice is heard, that I protect my rights, and that I can obtain financial stability to continue mental, emotional, and moral healing as a safety professional, retaliated against for caring about safety, in the Safety Department, by Safety Leadership.

## 9. Urgency and Need for Interim Relief

45) Emergency relief is necessary to prevent further irreparable harm to my reputation, livelihood, and mental health. Reinstatement will not only begin to restore what was unjustly taken but also allow me to re-engage fully with ongoing compliance and innovation efforts that align with national transportation safety. As Amtrak continues to post positions in line with my skills, each day I am excluded further deepens the injury. The loss of professional continuity, network access, and role legitimacy compounds daily, with permanent consequences if not promptly remedied.

46) I now face the remainder of the winter and holiday season with a limited and finite amount of money that does not cover all the expenses of basic living. These conditions are not speculative: they are present and ongoing and will worsen as unemployment benefits expire shortly.

47) Rather than engaging in good faith negotiations, Amtrak asked for global settlement between Lisa Stott and myself, refused two neutral mediators, haven't made a single offer in 6 months, and now want to delay mediation until February with no dates actually scheduled. When presented with the opportunity to negotiate directly and engage in the conversations to work out the basic logistics of it, they went silent. After providing direct and transparent notification of intent to file, offering reasonable solutions, and expressing the harm in delaying response to initiating the negotiation talks they requested over six months ago, and no response from them or ruling from OSHA, this leaves me no alternatives but to file and plead my case with

the Court. Delaying and stalling negotiations only hurts me, not them. And the longer they keep me from returning, the longer they have to create evidentiary concerns as my evidence supports, and pre-rehabilitate their brand image, avoid accountability, and continue to maintain the same retaliatory structures and same exact leadership that created and enabled retaliation, which creates risks for other employees trying to protect workers and passengers.

48) I would never have reported these concerns if I did not believe in Amtrak's mission and in the safety of its employees and passengers. I still believe reform is possible—but only if accountability is restored, and whistleblowers are protected rather than destroyed. I brought forward documented, data-driven concerns and was punished for doing so. That is not just unlawful. It is dangerous to the national traveling public.

I respectfully request that the Court grant emergency relief in this matter. I can provide banking account information and job application evidence at the Court's request to demonstrate that my reports are true and correct.

I declare under penalty of perjury that the foregoing is true and correct,

Executed on: 12/2a , 2025

*Jessica Carson*

Jessica Carson- Pro Se Plaintiff
902 State St
Osage, IA 50461
Phone: 641-330-1987
Email: jessicalynncarson1234@gmail.com